**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**CIVIL ACTION NO. 3:10-CV-299-JHM**

**CAUDILL SEED & WAREHOUSE CO., INC.**                                **PLAINTIFF**

**V.**

**HOUSTON CASUALTY COMPANY**                                **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Cross-Motions for Summary Judgment filed by Plaintiff Caudill Seed & Warehouse Co., Inc. ("Caudill Seed") [DN 40] and Defendant Houston Casualty Company ("Houston Casualty")[DN 41]. Fully briefed, this matter is ripe for decision. For the reasons discussed below, Plaintiff's Motion for Summary Judgment is denied and Defendant's Motion for Summary Judgment is granted in part and denied in part.

**I. STANDARD OF REVIEW**

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical

doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by " showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

## II. BACKGROUND

This action arises out of a dispute over the interpretation of an insurance contract between Caudill Seed and Houston Casualty. Caudill Seed produces, processes and distributes agricultural products including peanut products and alfalfa seeds. In December 2008, through Brokers Arthur J. Gallagher Risk Management Services, Inc. and Swett & Crawford, Caudill Seed obtained insurance coverage for expenses resulting from incidents of malicious product tampering and accidental product contamination of Caudill Seed products, or publicity relating to the incidents, from Houston Casualty. During the policy period, Caudill Seed suffered two contamination incidents that are the subject of litigation, one involving peanut products and the other involving alfalfa seed.

On April 28, 2009, Plaintiff filed suit against Houston Casualty for anticipatory breach of contract, declaratory judgment, bad faith and unfair claims settlement practices for both contamination incidents. Plaintiff asserts that Defendant refused to pay the full amount of coverage owed under the accidental contamination policy. An Amended Complaint was filed on January 27, 2011. The anticipatory breach of contract claim was bifurcated from the bad faith claim. The

parties have now filed cross-motions for summary judgment, Plaintiff on the anticipatory breach of contract claim and Defendant on all claims. At dispute are certain categories of losses that Plaintiff is claiming. Plaintiff claims that it is owed for lost gross profit, in-house inventory, returned material from customers, freight costs for returns, labor costs, legal fees and consulting fees for both the peanut products and alfalfa seed contamination incidents. (Pl.'s Mot. Summ. J. 10 [DN 40].) Defendant has adjusted Plaintiff's claims and contends that it is not liable for the peanut product claim, and, after applying the $50,000 deductible, it is liable for only a portion of the alfalfa claim. (Def.'s Mot. Summ. J. 23 [DN 41].)

### III. DISCUSSION

The issues raised in the parties' motions for summary judgment are governed by the principles of contract interpretation. The interpretation of an insurance contract is a question of law for the Court to decide. Kemper Nat'l Ins. Cos v. Heaven Hill Distilleries, Inc., 82 S.W.3d 869, 871 (Ky. 2002); Equitania Ins. Co. v. Slone & Garrett, P.S.C., 191 S.W.3d 552, 556 (Ky. 2006). "In construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself." Logan Fabricom, Inc. v. AOP P'ship LLP, 2006 WL 3759412, *2 (Ky. Ct. App. December 22, 2006). "[I]n the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret a contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." Frear v. P.T.A. Indus., Inc., 103 S.W.3d 99, 106 (Ky. 2003) (quotation and citation omitted). See also York v. Kentucky Farm Bureau Mutual Ins. Co., 156 S.W.3d 291, 293 (Ky. 2005) ("The clear and unambiguous words of an insurance contract should be given their plain and ordinary meaning."). However, "[i]f the contract language is ambiguous, it must be liberally construed to resolve any

3

doubts in favor of the insured." Wolford v. Wolford, 662 S.W.2d 835, 838 (Ky. 1984). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).

As the Kentucky Supreme Court states "[t]he reasonable expectation doctrine 'is based on the premise that policy language will be construed as laymen would understand it' and applies only to policies with ambiguous terms - e.g., when a policy is susceptible to two or more reasonable interpretations." True v. Raines, 99 S.W.3d 439, 443 (Ky. 2003) (quoting Simon v. Continental Ins. Co., 724 S.W.2d 210 (1986)). If an ambiguity does exist, "the ambiguous terms should be interpreted in favor of the insured's reasonable expectations. However, 'the mere fact that a party attempts to muddy the water and create some question of interpretation does not necessarily create an ambiguity.'" Id. (quoting Sutton v. Shelter Mut. Ins. Co., 971 S.W.2d 807, 808 (Ky. 1997)).

**A. Policy Provisions**

The Accidental Product Contamination Policy ("Policy") states that "[t]he Company agrees to indemnify the Named Insured for LOSS resulting directly from an ACCIDENTAL PRODUCT CONTAMINATION first discovered by the Named Insured during the Policy Period." Malicious Product Tampering/Accidental Product Contamination Insurance Policy, 3.

The relevant parts of the Policy at issue include the definition of ACCIDENTAL PRODUCT CONTAMINATION:

> (1) any accidental or unintentional contamination, impairment or mislabeling (including mislabeling of instructions for use) during the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured), of the Named Insured's Products (including their ingredients or components), or PUBLICITY implying such, or

>> (2) fault in design specification or performance of the Named Insured's PRODUCT(S)
>
> provided always that the consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has, within 120 days of such consumption or use, either resulted, or may likely result, in (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property, including animals and/or livestock - other than PRODUCT(s) of the Named Insured.

> Id. at 5.

PUBLICITY is defined as

> The reporting of an actual or alleged ACCIDENTAL PRODUCT CONTAMINATION during the Policy Period in local, regional or national media (including but not limited to radio, television, newspapers, magazines or the Internet) or any governmental publication where the Named Insured's PRODUCT(S) and the Named Insured are specifically named.

> Id. at 6.

The definition of LOSS is found under the Policy in four subparts: Recall Expenses, Lost Gross Profit, Rehabilitation Expenses, and Crisis Response/Consultant Expenses. Endorsement 2 defines Recall Expenses as:

> Any reasonable expenses necessarily incurred by the Named Insured in the procedure of recall, inspection, examination, destruction or disposal of the Named Insured's PRODUCT(S) - including but not limited to:
>
> (1) chemical analysis in order to ascertain whether the Named Insured's PRODUCT(S) have been contaminated and/or to ascertain the potential effect of the ACCIDENTAL PRODUCT CONTAMINATION,
> (2) transportation and relocation of the CONTAMINATED PRODUCT(S),
> (3) radio, television and print announcements, including the costs of any necessary correspondence,
> (4) salaries and/or wages of additional employees hired in connection with the resolution of a LOSS covered by this Policy (and all reasonable expenses incurred in connection with the hiring of said individuals),
> (5) remuneration paid to the hourly employees of the Named Insured (other than salaried employees) at a rate not to exceed the employee's base (hourly) rate of pay for straight time or overtime (if required),

> (6) expenses incurred by the Named Insured or its employees for transportation and accommodations,
> (7) expenses for rental of additional warehouse/storage space necessitated by an ACCIDENTAL PRODUCT CONTAMINATION covered by this Policy,
> (8) retail slotting fees and cancellation fees in connection with advertising and/or promotion commitments that were made by the Named Insured and which could not be honored by the Named Insured because of an ACCIDENTAL PRODUCT CONTAMINATION,
> (9) expenses incurred by the Named Insured to properly dispose of unused packaging and point-of-purchase marketing material in connection with a CONTAMINATED PRODUCT(S) if said CONTAMINATED PRODUCT(S) cannot be used or reused,
> (10) costs of cleaning the Named Insured's equipment and physical plant which has been contaminated solely and directly by CONTAMINATED PRODUCT(S),
> (11) the reasonable additional expenses which are both: (a) over and above expenses normally incurred in procuring product supplied by contract manufacturer sources and (b) incurred solely as a result of the Named Insured's inability to secure product from contract manufacturer sources customarily used by the Named Insured and
> (12) costs of redistributing rehabilitated product or replacement product.

All other terms and conditions remain unchanged.

Insurance Policy, Endorsement 2.

Endorsement 2 removed three paragraphs under Section A-Recall Expense of the original policy definition of Loss. The omitted paragraph at issue is "[t]he value of any recall or destroyed CONTAMINATED PRODUCT(S), including the value of packaging materials that cannot be reused, calculated on an actual cash value basis or a replacement cost basis, whichever is less." Id. at 4.

**B. Peanut Claim**

Plaintiff processed several peanut products that it sold to other processors and retailers. During the Policy Period, Plaintiff purchased raw peanuts from Peanut Corporation of America ("PCA") and Granola Kitchen, Inc ("GKI"). In January 2009, the Food and Drug Administration ("FDA") and the Center for Disease Control and Prevention concluded that an outbreak of Salmonella originated from peanut butter produced by Peanut Corporation of America. PCA was required by the FDA to recall several of its products. Plaintiff was contacted by both PCA and GKI about the potential contamination of the peanuts. In addition, in a letter from the Department of Health and Human Services to Dan Caudill, Plaintiff was advised that the FDA considered Caudill's products "to have posed an acute, life-threatening hazard to health" and approved of the Plaintiff's decision to pull its peanut products. Plaintiff worked with the FDA in the recall of its products, as well as complying with the FDA's on-site inspections.

In February of 2009, Plaintiff submitted a claim to Defendant stating that its products had been the subject of an Accidental Product Contamination. Plaintiff presented documents, written responses to inquiries from Defendant, and a calculation of losses. On September 29, 2009, Plaintiff received an email informing it that the claim had been denied because Caudill Seed did not demonstrate that the products were actually contaminated or that the publicity provision of the policy was triggered. Plaintiff then filed this suit alleging breach of contract.

Plaintiff contends that the policy covered the recall expenses relating to its peanut products, Defendant erroneously relied upon an actual contamination requirement, and the publicity of the possible contamination imposed liability on Houston Casualty. (Pl.'s Mot. Summ. J. 13-15 [DN 40].) Plaintiff asserts that there is no need to show that the products tested positive for Salmonella

because the products were clearly impaired due to the FDA investigation and conclusion. In the alternative, Plaintiff argues that an "FDA email sent by Elizabeth Hogan is a governmental publication that specifically names Caudill Seed and its products." (Id. at 16.) Furthermore, Plaintiff points to a letter from the Department of Health and Human Services which states that "information concerning Caudill Seed's Peanut Recall would be included in the FDA Enforcement Report, a government publication." (Id.)

Defendant states that the peanut product recall did not trigger the Accidental Product Contamination portion of the Policy because there was no actual contamination or impairment *during* the manufacturing process and there was no publicity implying contamination or impairment. "In other words, the Policy provides coverage if the product becomes flawed as part of the manufacturing process." (Def.'s Response to Pl.'s Mot. Summ. J. 8 [DN 43].) Defendant acknowledges that PCA's peanut contamination was highly publicized but no publications implicated Caudill Seed products. Defendant argues that the email sent by Elizabeth Hogan does not identify the senders and is not a governmental publication. In addition, the letter from the Department of Health and Human Services is not a government publication as the only intended recipient was Dan Caudill and the Plaintiff has not provided evidence that it was named in the FDA Enforcement Report.

After reviewing the language of the Policy, the Court finds that the Peanut Claim is not covered. The Court agrees that the impairment of the peanuts did not occur "*during* the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing of the Named Insured's PRODUCTS[.]" Insurance Policy, 5 (emphasis added). The FDA found that the source of the outbreak came from peanuts produced by PCA at a plant in

8

Blakely, Georgia. (Pl.'s Mot. Summ. J. 2 [DN 40].) PCA was required by the FDA to recall many of its products and notified Plaintiff of the contamination. (Id. at 3.) While Plaintiff was also directed by the FDA to recall its own products, the source of the contamination or impairment did not occur at Plaintiff's facilities. The peanuts were contaminated or impaired prior to Plaintiff obtaining them.

The Court also agrees with Defendant that there was no publication naming Caudill Seed or its products. Plaintiff provides an email from an employee of the FDA and a letter from the Department of Health and Human Services as governmental publications that Plaintiff argues trigger coverage under the policy. The email's recipients are unknown and the letter was sent to Plaintiff as a summary of the recall. It was not publicized. The letter from the Department of Health and Human Services, sent in November of 2009, agreed with the recall and stated that the recall would be reported in an upcoming issue of the FDA Weekly Enforcement Report. When asked in discovery about publication in the FDA Weekly Enforcement Report, Plaintiff stated that it was "unaware of any specific publication, and, accordingly, does not possess and cannot identify any FDA Enforcement Report" that named Caudill Seed. (Caudill Seed Disc. Resp. 19 [DN 41-9].)

As Plaintiff cannot prove any publication as defined under the policy and the contamination or impairment did not occur during the manufacturing process, the Peanut Claim is not covered. The Court grants summary judgment in favor of the Defendant on the Peanut Claim.

**C. Alfalfa Claim**

Plaintiff also purchases and resells raw alfalfa seed. In early 2009, Plaintiff purchased raw alfalfa seed from an Italian supplier. In March of 2009 there was a Salmonella outbreak which led the FDA to begin investigating Plaintiff's facilities. The FDA isolated the source of the outbreak

9

to Plaintiff's alfalfa seeds and a sample tested positive for Salmonella. Plaintiff announced a voluntary recall under FDA supervision and quarantined over $300,000 worth of alfalfa seed. In addition, Plaintiff worked with the FDA as they conducted on-site inspections.

There was publicity that cited Plaintiff as the source of the Salmonella outbreak. Plaintiff then retained a public relations consulting firm in order to take steps to maintain its reputation in the marketplace. Additionally, Plaintiff retained legal counsel with King & Spalding to assist in the recall of its products under FDA regulations.

Around April 2009, Plaintiff submitted its claim to Defendant stating that its alfalfa seed products had been the subject of an Accidental Product Contamination. Defendant has acknowledged that the alfalfa claim was covered by the policy. Plaintiff then submitted written responses and documentation regarding the contamination as well as an itemized summary of losses related to the recall. As a direct loss from the alfalfa recall, Plaintiff has submitted a total of $833,546.43 in losses incurred through lost gross profit, in-house inventory, returned material from customers, freight costs for returns, labor costs, legal fees and consulting fees. Once discovery was conducted, Defendant adjusted Plaintiff's claims and contends that, after applying the $50,000 deductible, it is only liable for a total of $174,828.00, which is a sum of freight costs for returns, lab costs/testing and lost gross profit. (Def.'s Mot. Summ. J. 23 [DN 41].)

### 1. Value of Recalled or Destroyed Contaminated Product

The original policy provisions, under the Section A-Recall Expense section, expressly provided coverage for the value of any recalled or destroyed product. However, Defendant has denied coverage for such losses. Defendant's position is that Endorsement 2 "expressly remov[ed] coverage for the value of recalled or destroyed products and losses from Caudill Seed's customers."

(Def.'s Mot. Summ. J. 10 [DN 41].) Because Endorsement 2 removed the paragraphs regarding the value of any recalled or destroyed product, Defendant reasons that it excluded the coverage for these items of loss. In addition, Defendant asserts that Endorsement 2 was added at the request of Plaintiff's wholesale broker in order to reduce the premium. (Id. at 12.) Defendant states that the clear intent of the parties was to remove coverage for the value of any recalled or destroyed product. (Def.'s Reply to Pl.'s Mot. Summ. J. 13 [DN 43].)

Plaintiff maintains that the value of recalled or destroyed product is a reasonable expense incurred as a result of the recall, even under Endorsement 2. Plaintiff points out that the list under the Recall Expenses is not an exhaustive list due to the language "including but not limited to." Insurance Policy, Endorsement 2. In addition, since Endorsement 2 concludes with the statement "[a]ll other terms and conditions remain unchanged," Plaintiffs states "it is reasonable to conclude that the remaining definitions and coverage provisions in Section 2 of the Policy are unaffected." (Pl.'s Mot. Summ. J. 20 [DN 40].) Plaintiff also denies that it ever asked for a reduction in coverage in Endorsement 2 as proposed by Defendant.

Alternatively, Plaintiff contends it is entitled to the value of lost product under the reaonsable expectations doctrine. Plaintiff states that it reasonably expected the terms and conditions of the Policy to provide coverage for product-value expenses as Houston Casualty had advertised coverage of the value of any contaminated products recalled or destroyed in a marketing brochure and in a Frequently Asked Questions section of a publication. (Pl.'s Mot. Summ. J. 21 [DN 40].) Plaintiff argues that if Defendant intended to expressly exclude product expenses it should have eliminated the "included but not limited to" language under Recall Expenses, or should have expressly stated that the value of the contaminated product is not covered. (Id.) Without such language, argues the

11

Plaintiff, an ambiguity is created as to whether the contaminated product value is covered and the ambiguity should be construed in favor of the Plaintiff.

"The policy and its endorsements validly made a part thereof together form the contract of insurance, and are to be read together to determine the contract actually intended by the parties." Kemper, 82 S.W.3d at 875. "Insurance contract law dictates that when an endorsement deletes language from a policy, a court must not consider the deleted language in its interpretation of the remaining agreement." Valassis Communication, Inc. V. Aetna Cas. & Sur. Co., 97 F.3d 870 (6th Cir. 1996) (see also Liberty Mutual Ins. Co. v. Blandford, 1999 WL 33756670 at *3 (W.D. Ky. 1999)). "The trial court must give effect to what the parties expressly agreed upon instead of placing a strained interpretation thereon contrary to the intent of the parties." Nationwide Mut. Inc. Co. v. Nolan, 10 S.W.3d 129, 131 (Ky. 1999) (quotation omitted).

The introductory language of Endorsement 2 states that "[i]t is agreed that A - Recall Expenses in the definition of LOSS in Section 2 (Accidental Product Contamination) of the Certificate is hereby amended to read as follows[.]" Insurance Policy, Endorsement 2. What follows is identical to the original policy language except for the omission of three paragraphs, including one that specifically provides coverage for the value of any recalled or destroyed contaminated product. The effect of removing these original provisions does not result in the exclusion of this coverage as argued by the Defendant. Reading the policy language, as modified by the endorsement, the policy does not expressly provide for the coverage of the value of recalled or destroyed products. However, neither does the policy language expressly exclude these items.

12

The policy simply states that it covers "any reasonable expenses necessarily incurred" and then includes a non-exhaustive list of twelve items. No ambiguity has been created by Endorsement 2.

The remaining question therefore is, whether the value of the destroyed in-house inventory and returned material from customers were reasonable recall expenses that were necessarily incurred in the procedure of recall, inspection, examination, destruction or disposal. This is not a matter of law for the Court to decide. As issues of material fact still remain in determining whether these losses were reasonable, summary judgment is inappropriate.

**2. Consulting Firms**

Plaintiff states that it was reasonable in securing a public relations consulting firm and consulting group given the media attention over the alfalfa recall and these were reasonable expenses that should be covered under the Policy. Defendant argues that the policy does not provide coverage for Plaintiff's public relations and consulting costs.

> Crisis Response/Consultant Expenses under Loss in the policy is defined as
>
> All reasonable and necessary fees and expenses of Corporate Risk International; or, provided the Company has given prior written consent, fees and expenses of any other persons (including public relations consultants and recall consultants) retained by the Named Insured to assist in the investigation of (and/or response to) an ACCIDENTAL PRODUCT CONTAMINATION.
>
> Insurance Policy, 5

Defendant has a relationship with Corporate Risk International to provide consulting services without applying the deductible. Insurance Policy, 5. Since Plaintiff never received prior written consent to use the public relations firm or consulting group of its choice, Defendant reasons that it is not obligated to pay these expenses.

13

The Court agrees with the Defendant. While it may be reasonable to hire a public relations firm and a consulting group to deal with the recall, the Policy expressly requires the insured to obtain prior written consent before it will pay the fees and expenses of a public relations or recall consultant other than Corporate Risk International. Plaintiff did not obtain the necessary consent. Accordingly, the Court will grant Defendant's motion for summary judgment as a matter of law in regards to fees for the public relations firm and the consulting group.

**3. Legal Fees**

Under Exclusions in the Policy, "[t]he Company shall not be liable for any payment under Section 2 caused by (or arising from or attributable to) any of the following:

. . .

E- bodily injury, sickness, disease or death of any person or animal, or damage to or destruction of any property, including loss of use thereof, or for any legal fees, legal judgments, legal settlements or liability whatsoever

Insurance Policy, 6.

Defendant contends that this language excludes all legal fees. Alternatively, Defendant has raised issues of reasonableness of the fees arguing that a portion, if not all of the legal fees, are merely consulting fees that are not recoverable since consultant expenses require prior written consent. Because Plaintiff refers to the legal fees as "legal consulting costs" at times, Defendant reasons that some legal fees are really consulting costs which are not covered by the Policy without prior written consent. Insurance Policy, 5.

Plaintiff contends that legal fees are covered under Recall Expenses since these costs "were reasonable expenses necessarily incurred in the procedure of recall, inspection, examination, destruction or disposal" of Caudill Seed's products. Insurance Policy, Endorsement 2. Plaintiff

14

argues it was a reasonable expense to secure competent legal counsel, King & Spalding, to guide them through the FDA recall process and advise on any legal implications." (Pl.'s Mot. Summ. J. 22 [DN 40].) Additionally, Plaintiff states that the exclusion stated above is only excluding legal fees associated with personal injury litigation and does not exclude "legal fees incurred in the procedure of recall, inspection, examination, destruction or disposal of its products." (Pl.'s Response to Def.'s Mot. Summ. J. 4 [DN 42].)

The policy does not clearly state that legal fees related to the recall process are excluded by the policy. "Any limitation on coverage or an exclusion in a policy must be clearly stated in order to apprise the insured of such limitations." St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc. 870 S.W.2d 223, 227 (Ky. 1994). If Defendant intended to exclude all legal fees that were incurred as a reasonable expense related to a recall, it should have been clearly excluded, not included as part of a paragraph that solely discusses losses as a result of bodily injury, sickness, disease, death and the destruction of property. The Court construes this language to exclude legal fees, legal judgments, legal settlements or liability from actions brought by others against the insured.

Alternatively, the Court agrees with Plaintiff that the legal fees in Exclusion E create an ambiguity. There are two ways to read the exclusion, one interpretation is that no legal fees are covered under the policy, and the other interpretation is that only legal fees incurred in defending actions brought by others are excluded. In light of the ambiguity, the policy must be construed liberally in favor of the insured. The reasonable expectation doctrine "resolves an insurance-policy ambiguity in favor of the insured's reasonable expectations." True, 99 S.W.3d at 443.

15

As a result, the Court finds that the Policy provides for reasonable legal fees if shown to be necessarily incurred in the recall process. Defendant has raised an issue as to the reasonableness of the legal fees and, at this time, the Court is not able to determine which fees are legal fees and which are consulting fees. This leaves a genuine dispute as to the amount of legal fees owed to Plaintiff. Accordingly, summary judgment as a matter of law is inappropriate for Plaintiff's claim of legal fees.

**4. Labor Costs**

Recall Expenses covered under the policy include "remuneration paid to the hourly employees of the Named Insured (other than salaried employees) at a rate not to exceed the employee's base (hourly) rate of pay for straight time or overtime (if required)[.] Insurance Policy, Endorsement 2. Plaintiff submitted a worksheet to Defendant that included a breakdown of accounting staff costs and operations staff costs. (Pl.'s Mot. Summ. J., Ex. 16 [DN 40-16].) Accounting staff costs were listed by person and the number of hours each person worked. Operation staff costs were listed by department and the total number of hours each department worked in regards to the recall. (Id.) The worksheet did not include any hourly rates of pay, only a total monetary amount for accounting staff costs and a total monetary amount for operation staff costs.

Plaintiff contends that "Houston Casualty's own adjuster acknowledged the validity of these additional labor expenses in an adjustment worksheet sent to Caudill Seed." (Pl.'s Reply to Def.'s Mot. Summ. J. 3 (citing an email from Michael Tocicki) [DN 42].) In addition, Plaintiff states that Defendant never asked for clarification of the claimed labor expenses and relied on the adjuster's email in assuming that the labor costs were not at issue.

Defendant contends that Plaintiff has not met its burden in supporting the position that Defendant owes labor costs because it has not provided information needed to evaluate the coverage. (Def.'s Mot. Summ. J. 19 [DN 41].) Defendant states it has asked for more detailed information repeatedly. In addition, Defendant points out that the policy does not cover the salaried accounting staff that worked on the alfalfa claim. Defendant specifically draws attention to Caudill Seed's Chief Financial Officer being listed as an hourly employee under accounting staff. (Def.'s Reply in Support of M. Summ. J. 7 [DN 45].) As pointed out by Defendant, "[u]nder Kentucky law, the party seeking to establish coverage bears the burden of establishing that the incident at issue was within the scope of the policy." Secura Ins. Co. v. Gray Const., Inc., 717 F.Supp.2d 710, 714-15 (W.D.Ky. 2010). Defendant argues that since Plaintiff has not met its burden of establishing coverage, summary judgment is appropriate.

The policy clearly states that the definition of loss includes "remuneration paid to the hourly employees of the Named Insured (other than salaried employees) at a rate not to exceed the employee's base (hourly) rate of pay for straight time or overtime (if required)[.]" Insurance Policy, Endorsement 2. There can be no dispute as to coverage of Plaintiff's expenses incurred as a result of paying its hourly employees for their work as part of the recall. What is at dispute is the total amount owed under this provision. Based upon the record as it now exists, neither party is entitled to judgment as a matter of law on this claim. Accordingly, summary judgment is inappropriate for the claim of loss due to labor costs.

### 5. Lost Gross Profits

Plaintiff seeks payment for Lost Gross Profits as defined in the Policy in its motion for summary judgment. [DN 40.] As Defendant has apparently conceded that Plaintiff is owed the sub-policy limit for the Lost Gross Profit, this amount is not in dispute.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the Plaintiff's motion for summary judgment [DN 40] is **DENIED** and Defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

cc: counsel of record